**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **REUBEN RIVERA,** | : | |
| | : | |
| **Petitioner** | : | |
| | : | **CIVIL NO. 3:CV-06-0716** |
| **v.** | : | |
| | : | **(Judge Caputo)** |
| **LOUIS FOLINO,** *et al.*, | : | |
| | : | |
| **Respondents** | : | |

**M E M O R A N D U M**

**I.    Introduction**

Reuben Rivera, a state prisoner incarcerated at the Graterford State

Correctional Institution (SCI-Graterford), in Graterford, Pennsylvania, has filed a *pro*

*se* petition for writ of habeas corpus pursuant to the provisions of 28 U.S.C. § 2254,

a supporting memorandum and exhibits.  (*See* Docs. 1 - 4.)  Mr. Rivera challenges

his 1994 convictions in the Court of Common Pleas of Lebanon County,

Pennsylvania for first degree murder and criminal conspiracy to commit criminal

homicide.  Mr. Rivera was convicted following a jury trial and is serving a life

sentence.

For the reasons expressed below, this Court will deny the Petition with

prejudice and decline to issue a certificate of appealability.

II.     **Background**

*A.     Factual Background*

This case arises out of the murder of Dennis Glant (victim) on August 16,

1993.  Mr. Rivera does not dispute that he stabbed Mr. Glant, but rather claims he

did so in self-defense, and without any intent to kill him.

On November 12, 1993, Mr. Rivera was charged with one count each of

criminal homicide and criminal conspiracy.  He was tried before a jury on April 6 - 8,

1994.  (Doc. 3, ECF p. 4, *Commonwealth v. Rivera*, No. 93-10961 (Lebanon Ct.

Com. Pl., Nov. 18, 1994).

A detailed recitation of the underlying facts is necessary to the discussion of

the claims presented in this matter.  The following is a lengthy excerpt from the trial

court's opinion denying Mr. Rivera's post-sentence motions, and provides a helpful

summary of the testimony adduced at trial:

> Waldo Mercado, who also was charged in the murder,
> testified for the prosecution.  Mercado testified that early in
> the evening on August 16, 1993, he, Reuben Rivera and
> Jon Lebo were sitting on the steps of a house ... in
> Lebanon ... drinking beer.
>
> Mercado testified that after the three men saw the victim,
> Dennis Glant, drive up and stop in front of the house, Lebo
> told [Rivera] to punch the victim.  [Rivera] went to the
> victim's car window and complied with the request, and the
> victim drove off ... Lebo then suggested to [Rivera] that
> they 'go beat somebody up,' and [Rivera] and Lebo walked
> [away] ... Mercado followed them shortly thereafter,
> believing they were going to get into
> trouble.[1]

---

[1] A representational diagram of the streets at issue follows:

(continued...)

Mercado followed Lebo and [Rivera] down Lehman Street and saw [Rivera] stop at an establishment called 'The Spanish Store.' He saw Lebo continue down Lehman Street and stop at the corner of 10th and Lehman Streets. Mercado followed Lebo, and when he caught up with him on 10th Street, saw the victim standing a couple of feet away. The victim was holding a wrench.

Lebo approached the victim, addressed him, then hit him in the face. The victim did not fight back; instead, he crossed 10th Street and went north to Lehman Street. [Rivera] came down 10th Street and approached Lebo and Mercado. Lebo told [Rivera] the victim was 'talking shit.'

[Rivera] then crossed 10th Street, went north and began to follow the victim on Lehman Street. Lebo went south to Church Street and turned north on Partridge Street, which connects Church and Lehman Streets. Mercado followed Lebo, and when he arrived at the corner of Church and Partridge, he saw the victim and Lebo arguing. Mercado then saw [Rivera] walk south on Partridge toward the victim and Lebo, and stop directly behind the victim. He heard [Rivera] ask, 'What's up?' He saw [Rivera] pull out a knife

---

[1](...continued)



(Doc. 3, Trial Ct. Op. Den. Post-Sentence Mot., fn. 1 at ECF p. 5.)

and stab the victim in the back.  The victim died the next day in a local hospital.

Mercado testified that the victim never swung the wrench at either [Rivera] or Lebo, and never made any threatening gestures at all.  Mercado followed [Rivera] from the scene to a home on Lehman Street, where [Rivera] told Mercado, 'I think I stabbed him.'  [Rivera] asked Mercado to retrieve the knife, but Mercado refused. [Rivera] also told Mercado to tell the police that the victim had hit him with the wrench.

Mercado testified that he had agreed to plead guilty to Hindering Apprehension and to assist in the prosecution of [Rivera], provided the District Attorney were to recommend to the sentencing judge that he receive a one-to two-year sentence for his offense.

Michael Felty, a 10–year-old boy who lives on Partridge Street in Lebanon, was riding his bicycle near his home when he saw four men.  He identified one of the men as Dennis Glant, the murder victim.  He stated three men were beating the victim and that one man was south of the victim and one was north of the victim.  Alarmed, he went home and returned with his father.  When he returned, he heard the victim screaming for an ambulance.

Michael Felty testified that the victim was holding a wrench near his head during the fight but was not swinging it.  He testified that he did not see the victim punching at the other men.

Witness Tonya Arehart testified that on the night of the assault she was riding in a car with four friends when she saw Jon Lebo, Waldo Mercado, and Reuben Rivera on Partridge Street.  She saw Waldo Mercado as he stood on the corner of Partridge and Lehman Streets, and saw Jon Lebo and Reuben Rivera as they were walking down Partridge Street toward Church Street.  She also saw the victim staggering in the street, saying he was dying and asking for help.  She asked the driver to stop the car and, after seeing that the victim was wounded, knocked on a door to seek help.  Tonya, like Michael, did not see the victim strike anyone with the wrench he was holding.

. . .

-4-

William Davis, Jr., testified that he lived near the corner of 10th and Partridge Street at the time of the murder, and saw a knife on the sidewalk next to the house where he lived immediately after he noticed the activities surrounding the victim.

Detective Greg Holler of the Lebanon City Police Department stated that he interviewed the Defendant Reuben Rivera after receiving information, via an anonymous phone call, that he might be connected with the murder.  [Rivera] told Detective Holler that he was in Allentown, Pennsylvania, on the date of the murder.

Detective Daniel Kauffman of the Lebanon City Police testified that [Rivera] voluntarily came to the Lebanon Police Department on August 20, about 36 hours after the Police Department made it known that a warrant had been issued for his arrest.  [Rivera] told Detective Kauffman that he and Jon Lebo had talked with the victim on the night of the murder and [that Rivera] had hit the victim while the victim was in his car.   He told Detective Kauffman that afterward, he, Mercado, and Lebo walked to 10th and Lehman Streets, and [that] Lebo and Mercado went south on 10th Street while he stayed at the corner talking with another person.  He then saw the victim with Mercado and Lebo on 10th Street and walked down 10th Street to join the group.  He said he saw that the victim was holding a wrench.

[Rivera] then told Detective Kauffman that the victim crossed 10th Street and returned to Lehman Street, and he followed.   When [Rivera] arrived at the intersection of Lehman and Partridge streets, he looked south on Partridge to see Lebo, Mercado and the victim.  [Rivera] said he approached the group and the victim turned and struck him on the forearm with a wrench. [Rivera] then took out his knife and, using his left hand to make a 'roundhouse' swing, stabbed the victim.

Dr.  Wayne K. Ross, a forensic pathologist, testified that the wound inflicted upon the victim caused his death.  He testified that the victim also had a large bruise on the left side of his head, which had been inflicted less than an hour before he was admitted to the hospital.  The stab wound

began in the lower back and continued through the victim's diaphragm and kidney and ended in his liver.   The wound caused uncontrollable bleeding.

Dr.  Ross testified that the knife, which he examined during the autopsy of the victim, entered the victim's back at a downward angle of 60 degrees, and [that] its upper haft struck the victim's back with such force as to abrade the skin.  The knife was nine inches long, including its handle, and its blade was five inches long.  The stab wound was five and a quarter inches long.  Dr. Ross explained that the wound was longer than the knife blade because the human body is somewhat compressible.  Dr.  Ross opined that the wound was consistent with a person delivering a side blow directed downward.  He also opined that a 'severe amount of force' was needed to inflict the wound he saw, consistent with a purposeful, determined movement.

Dr.  Ross also testified that the victim exhibited no defensive wounds, implying that he was taken by surprise by the knife attack.  He concluded that the wound was the result of a 'determined aggressive insertion' of a knife. Moreover, Dr.  Ross opined that the victim would not have been [in] a position to use deadly force against the person who wielded the knife at the time the wound was inflicted, as he was not in the correct position to use such force.

Dr.  Ross also testified that a left-handed 'roundhouse' blow was not consistent with the nature and location of the wound.  He also stated the parties to the wounding were not in motion relative to each other at the time of the wounding.

Detective Holler testified that when he interviewed [Rivera] on August 17, the day after the murder, he saw no bruises or other injuries to [Rivera].

[Rivera] called Nicholas T. Forbes, M.D., a forensic pathologist, to testify in support of his argument that he was struggling with the victim when he accidentally stabbed him.  Dr. Forbes testified that what Dr. Ross described as 'defensive wounds' do not always explain the nature of wounds if a struggle occurred.  He noted that the victim may have moved backward at the time when the knife was in a position to wound him.  Given the sharp nature of the

knife's point and its heaviness, Dr. Forbes stated the knife could have inflicted a five-inch wound without the use of much force once it had penetrated the skin of the victim. Thus, Dr. Forbes opined the stabbing could have been accidental and not purposeful. He agreed, however, that the lack of defensive wounds was more consistent with a surprise attack and conceded that the wound was more consistent with an intentional assault rather than self-defense.

Dr. Forbes also testified that it was not unusual for a knife wound to be deeper than the length of the knife blade, because of the compressibility of flesh. Finally, Dr. Forbes testified that he could not, within a reasonable degree of medical certainty, state that the wound that resulted in the victim's death arose from a surprise attack. At the same time, he stated that he could not testify that the wound resulted from an act of self-defense.

[Rivera] took the witness stand and testified that on the night of the murder, he and Jon Lebo, after drinking about 60 ounces of beer each, were sitting on the steps of a house near 11th and Lehman streets in Lebanon. He said Dennis Glant, the victim, pulled up in a car, and Jon Lebo spoke to him. [Rivera] approached the car and placed his hand on the window post. The victim asked him a question, and then Jon Lebo told [Rivera] to punch the victim. The victim put his hand over [Rivera's] hand on the window post, apparently to prevent [Rivera] from striking him and began driving off. [Rivera] pushed the victim's hand off his own and moved away from the car. The victim drove off down Lehman Street.

A few minutes later, [Rivera] and Lebo, for no particular reason, began walking on Lehman Street toward 10th Street. Mercado joined them, and [Rivera] stopped in front of The Spanish Store on Lehman Street to speak with an acquaintance. Mercado and Lebo went to 10th street and turned south on 10th toward Church Street.

[Rivera] testified that when he arrived at the corner of 10th and Lehman, he looked south on 10th Street to see that Mercado and Lebo were almost at the corner of 10th and Church Streets, and the victim was in front of them. He saw Lebo punch the victim, and noticed that the victim held

-7-

a wrench. [Rivera] walked close to the three and addressed them.  The victim then backed away from Mercado and Lebo and began walking toward Lehman Street, moving closer to [Rivera].  [Rivera] crossed the street to avoid the victim, then looked for Mercado and Lebo.  Seeing they were still at the corner of 10th and Church Streets, he then looked around for the victim but did not see him.

[Rivera] stated he returned to Lehman Street, walked to Partridge Street, and went south on Partridge.  He saw his friends at the south end of Partridge moving north toward him and saw the victim as well.  He saw the victim and Lebo arguing and Mercado trying to interfere by pulling Lebo away.

[Rivera] said he approached and the victim swung the wrench at him. [Rivera] grabbed the victim in a bear hug then pushed him away.  The victim approached [Rivera] again, raising his wrench, and [Rivera] grabbed him in a bear hug again.  When the victim began slipping away, [Rivera] stabbed him. [Rivera] then pushed the victim away and ran off.

[Rivera] admitted to throwing the knife between some houses on Church Street and running back to the home of his girlfriend's mother.  He admitted to lying to the police the next day.  He stated he stabbed Dennis Glant because he was scared and that he never intended to kill him.

(Doc. 19-10, *Commonwealth v. Rivera*, No. 93-10961 (Lebanon Ct. Com. Pl., Nov. 18, 1994, ECF pp. 2 - 12)(unpublished op.)(internal citations omitted)).

On June 8, 1994, the trial court imposed a life sentence upon Mr.  Rivera.  He filed post-sentence motions on June 20, 1994.  (*See* Doc. 19-8, Mr. Rivera's Post-Sentence Mot.)  Among other issues, Mr.  Rivera challenged the sufficiency of the evidence with respect to the charges of Homicide and Criminal Conspiracy.  *Id*. Specifically, Mr.  Rivera argued that:

1.  the evidence presented [at trial] was not sufficient to prove the elements of criminal conspiracy to commit

homicide beyond a reasonable doubt.  Specifically, the Commonwealth failed to show an agreement, between Rivera and any other party, including Jonathan Lebo and Waldo Mercado, to commit the crime of criminal homicide upon Dennis Glant; and

2.  the evidence presented [at trial] is not sufficient to prove the elements of murder in the first degree beyond a reasonable doubt.

(Doc. 19-9, Mr. Rivera's Post-Sentence Mot. Br., ECF p.  2.)  On November 18, 1994, the trial court denied Mr. Rivera's post-trial motions.


B.    *Direct Appeal*

On December 14, 1994, Mr.  Rivera filed a Notice of Appeal to the Pennsylvania Superior Court from the trial court's order of November 18, 1994.  Mr. Rivera raised three issues in his direct appeal to the Pennsylvania Superior Court. (*See* Doc. 19-11, Appellee's Br.)  Aside from other issues, Mr.  Rivera's challenged "[w]hether sufficient evidence exist[ed] to justify the jury's verdicts of guilty."  (*Id*., ECF p.  7.)

On July 11, 1995, the Pennsylvania Superior Court affirmed, adopting the trial court's opinion in its entirety.  (Doc. 19-12, *Commonwealth v. Rivera*, 446 Pa. Super. 681, 667 A.2d 423 (Pa. Super. July 11, 1995)(Table, No. 00054 HBG 95)(unpublished op.))  The court held that "[a]fter carefully reviewing the parties' briefs and the record of the proceeding below, we find that the trial court has thoroughly addressed these issues in its well-reasoned opinion" and "affirm[ed] for the reasons stated therein."  (*Id*., ECF p.  3.)

On August 7, 1995, Mr. Rivera filed a Petition for Allowance of Appeal to the

-9-

Pennsylvania Supreme Court.  (*See* Doc. 19-13, Pet. for Allowance of Appeal.)  On

March 29, 1996, the Pennsylvania Supreme Court denied Mr. Rivera's petition.

(*See* Doc. 19-14, *Commonwealth v. Rivera*, 544 Pa. 605, 674 A.2d 1070 (Pa.

1996)(Table No. 0399 M.D. Alloc. 1995)(unpublished op.))  Mr. Rivera did not seek

review in the United States Supreme Court.


     *C.*     *PCRA Proceedings*

     On October 21, 1996, Mr.  Rivera filed a timely *pro se* petition for collateral

relief under the Pennsylvania Post Conviction Relief Act (PCRA), 42 Pa. C.S. §§

9541-9546.  (*See* Doc. 19-15, PCRA Pet.)  On June 20, 2002, with the assistance of

counsel, Mr.  Rivera filed an Amended Petition for Post Conviction Relief.  (*See* Doc.

19-17, Am. PCRA Pet.)  In his Petition, Mr.  Rivera argued that trial counsel was

ineffective by failing "to investigate and introduce evidence of the victim's violent

nature and propensity for violence" and that such ineffectiveness was the result of

trial counsel's "misunderstanding and/or lack of knowledge of the law as it existed at

that time."  (*Id*., ECF p.  2.)

     On October 25, 2004, a full evidentiary hearing on the Amended PCRA

Petition was held before the trial court, now acting as the PCRA court.  (*See* Doc.

19-18, Tr. PCRA Hr'g Proceedings.)  On January 12, 2005, the PCRA court denied

the Amended PCRA petition.  (*See* Doc. 19-21, *Commonwealth v. Rivera*, No. 1993-

10961(Lebanon Ct. Com. Pl., Jan. 12, 2005)(unpublished op.)).

Mr. Rivera's timely appeal to the Pennsylvania Superior Court raised the following issues:

> A. The Trial Court erred in holding that the Protection from Abuse Order and/or Contempt Orders of the violations of the PFA's filed against Glant were insufficient and/or irrelevant to establish he had propensities toward violence in showing that he acted as the aggressor and [Mr. Rivera] was acting in self-defense.

> B. The Trial Court erred in failing to find that [Mr. Rivera's] trial counsel was ineffective so as to undermine the truth determining process that no reliable adjudication of guilt or innocence could have taken place.

(*See* Doc. 19-22, Appellant's PCRA Br. on Appeal, ECF p. 2.)  On August 17, 2005, the Superior Court of Pennsylvania affirmed the decision of the PCRA court.  (Doc. 19-24, *Commonwealth v. Rivera*, No. 223 MDA 2005 (Pa. Super. Aug. 17, 2005)(unpublished op.)).  The superior court held that: (1) since Mr. Rivera did not know the victim prior to the night of the murder, he was not entitled to use evidence of the victim's character to show that he believed his life to be in danger due to the victim's reputation for violence; (2) the allegations which served as the basis for the issuance of the PFA Orders against Mr. Glant were themselves inadmissible because the PFA Orders were obtained as a result of a civil, rather than a criminal, proceeding where the complainant's burden of proof is lower than in criminal matters; and (3) Mr. Glant's criminal contempt conviction for violating the PFA was also inadmissible as it "did not involve aggressive behavior similar in character to that in the instant case," rather Mr. Glant was convicted of criminal contempt due to his presence at his wife's home, an event prohibited by the PFA.  (*Id.*, ECF p. 4 - 5.) As for Mr. Rivera's trial counsel's alleged failure to call witnesses concerning the

victim's reputation for violence, the court dismissed this claim finding he had failed to present testimony or sworn statements at the PCRA hearing from any witness as to the substance of their potential trial testimony, and thus he did not carry his burden on this claim.  (*Id.*, ECF p. 6 - 7.)   Based on these findings, the court found Mr. Rivera was not prejudiced by his counsel's alleged failure to introduce this information as to the victim's propensity for violence.

On August 29, 2005, Mr. Rivera filed a timely appeal to the Pennsylvania Supreme Court.  (*See* Doc. 19-25, Pet. for Allowance of Appeal.)  The Pennsylvania Supreme Court denied the Petition on March 15, 2006.  (*See* Doc. 19-26, *Commonwealth v. Rivera*, No. 736 MAL 2005 (Pa., Mar. 15, 2006)).

### D.   Federal Habeas Corpus Proceedings

On April 6, 2006, Mr. Rivera filed the instant Petition for Writ of Habeas Corpus in which he raises the following challenges to his conviction and sentence:

> 1.   Petitioner was denied his constitutional right to due process of law, in that the state court applied an unreasonable determination of fact in ruling that the prosecution had proven beyond a reasonable doubt every element to constitute first-degree murder.
>
> 2.   Petitioner was denied his constitutional right to due process of law, in that the state court applied an unreasonable determination of fact in ruling that the prosecution had proven beyond a reasonable doubt every element to constitute petitioner was guilty of conspiracy to commit murder.
>
> 3.   Petitioner was denied his constitutional right to due process of law, in that the state court applied an unreasonable application of law in concluding that evidence of victim's violent character, via prior criminal conviction for

>       contempt of protection from abuse order, was not
>       admissible.

(Doc. 2, Mem. in Supp. of Habeas Pet., ECF pp. 8, 12 and 14.)

In accordance with *United States v. Miller*, 197 F.3d 644 (3d Cir. 1999) and *Mason v. Meyers*, 208 F.3d 414 (3d Cir. 2000), the Court issued formal notice to Mr. Rivera that he could either have the petition ruled on as filed, that is, as a § 2254 petition for writ of habeas corpus and heard as such, but lose his ability to file a second or successive petition, absent certification by the court of appeals, or withdraw his petition and file one all-inclusive § 2254 petition within the one-year statutory period prescribed by the Antiterrorism Effective Death Penalty Act (AEDPA).  (*See* Doc. 8.)  On May 1, 2006, Mr. Rivera returned the notice of election form, indicating that he wished to proceed with his petition for writ of habeas corpus as filed.  (*See* Doc. 10.)  Thus, a Show Cause Order was issued on May 2, 2006.  (*See* Doc. 11.)  On May 25, 2006, the District Attorney of Lebanon County filed a response to the petition.  (*See* Docs. 16, 17 and 19.)  Mr. Rivera did not file a traverse.

### III.    Standard of Review

On April 24, 1996, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104-132, 110 Stat. 1214 (1996), went into effect and amended the standards for reviewing state court judgments in federal habeas petitions filed under 28 U.S.C. § 2254.  A habeas corpus petition pursuant to § 2254 is the proper mechanism for a prisoner to challenge the "fact or duration" of his confinement.

*Preiser v. Rodriguez*, 411 U.S. 475, 498-99, 93 S.Ct. 1827, 1841, 36 L.Ed.2d 439 (1973). Federal habeas review is restricted to claims based "on the ground that [petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Accordingly, a claim must be cognizable for purposes of federal habeas review, meaning that such review is limited to determining whether a conviction violated federal law. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991); *see also Johnson v. Rosemeyer*, 117 F.3d 104 (3d Cir. 1997).

Mr. Rivera's habeas petition is governed by the AEDPA as it was filed after April 24, 1996. The AEDPA imposes the following standard of review that a federal court must utilize when reviewing such applications:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceeding.

28 U.S.C. § 2254(d).

For the purpose of § 2254(d), a claim has been "adjudicated on the merits in state court proceedings when a state court has made a decision that finally resolves

the claim based on its substance, not on a procedural, or other, ground." *Thomas v. Horn*, 570 F.3d 105, 117 (3d Cir. 2009). Under 28 U.S.C. § 2254(e)(1), when a state court reaches the merits of a claim, a "federal habeas court must afford a state court's factual findings a presumption of correctness and ... the presumption applies to factual determinations of state trial and appellate courts." *Fahy v. Horn*, 516 F.3d 169, 181 (3d Cir. 2008). The applicant bears the burden of rebutting the presumption of correctness by providing "clear and convincing evidence" of the state court's error. 28 U.S.C. § 2254(e)(1). This presumption of correctness applies to both explicit and implicit findings of fact. *Campbell v. Vaughn*, 209 F.3d 280, 285-86 (3d Cir. 2000). A decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d)(2), (e); *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003).

Next, the court must examine the independent meanings of the "contrary to" and "unreasonable application" clauses of 28 U.S.C. § 2254(d). *Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002). A state court judgment is "contrary to" federal law when it is "diametrically different, opposite in character or nature, or mutually opposed" to "clearly established" decisions of the United States Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405-06, 120 S.Ct. 1495, 1519-20, 146 L.Ed.2d 389 (2000). This may occur if "the state court ignores or misapprehends clear precedent or it 'confronts a set of facts that are materially

-15-

indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Wilkerson v. Klem*, 412 F.3d 449, 452 (3d Cir. 2005)(quoting *Williams*, 529 U.S. at 406, 120 S.Ct. at 1519-20). But, a state court decision is not contrary to clearly established law because it failed to cite applicable Supreme Court precedent. *Mitchell v. Esparza, 540 U.S. 12, 16, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003).* The state court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 365, 154 L.Ed.2d 263 (2002).

State court decisions which are not "contrary to" Supreme Court law may only be set aside on federal habeas review "if they are not merely erroneous, but 'an *unreasonable* application' of clearly established federal law, or are based on 'an *unreasonable* determination of the facts.'" *Early*, 537 U.S. at 11, 123 S.Ct. at 366 (citing 28 U.S.C. § 2254(d))(emphasis in original). Consequently, a state court decision that correctly identified the governing legal rule may be rejected if it unreasonably applied the rule to the facts of a particular case. *Williams*, 529 U.S. at 413, 120 S.Ct. at 1523; *McMullen v. Tennis*, 562 F.3d 231, 236 (3d Cir. 2009). However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show that the state court's application of Supreme Court law was "objectively unreasonable." *Woodford v. Visciotti*, 537 U.S. 19, 27, 123 S.Ct. 357, 361, 154 L.Ed.2d 279 (2002). An "unreasonable application" is different from an *incorrect* application of federal law." *Williams,* 529 U.S. at 409-410, 120 S.Ct. at

1522.  "In determining whether the state court unreasonably applied Supreme Court precedent, the question is whether the state court's application of federal law was objectively unreasonable, not whether the application was, in the judgment of the federal habeas court, erroneous or incorrect." *Siehl v. Grace*, 561 F.3d 189, 195 (3d Cir. 2009).

The Third Circuit has set forth a two-step process for reviewing a § 2254 petition.  First, the court must identify the applicable Supreme Court precedent. *Outten v. Kearney*, 464 F.3d 401, 413 (3d Cir. 2006).  The Petitioner must show that the Supreme Court precedent requires the opposite result, not merely that his interpretation is more plausible than that of the state court.  *Id*.  Second, the federal habeas court must objectively evaluate whether the state court decision was an unreasonable application of Supreme Court precedent.  *Id.*, 464 F.3d at 414(citing *Werts v. Vaughn*, 228 F.3d 178 (3d Cir. 2000)).  The district court cannot grant relief simply because "we disagree with the state court's decision or because we would have reached a different result."  *Id*.  We may only grant relief if "the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent."  *Id*. (quoting *Hackett v. Price*, 381 F.3d 281, 287 (3d Cir. 2004)).

Finally, "[i]n considering a § 2254 petition, we review the 'last reasoned decision' of the state courts on the petitioner's claims."  *Simmons v. Beard*, 590 F.3d 233, 232, (3d Cir. 2009)(quoting *Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2008).

**IV.    Discussion**

*A.    Timeliness of Federal Habeas Petition.*

Respondent has raised an objection to the timeliness of Mr. Rivera's petition. Upon review, the Court finds the Petition timely.

A petitioner confined under a state-court judgment has one year to file a § 2254 petition challenging the judgment. 28 U.S.C. § 2244(d)(1). As relevant here, the limitations period runs from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." *Id.* at § 2244(d)(1)(A). This language applies to the right to seek discretionary review in state appellate courts and means that the judgment does not become final until the time period for seeking such review expires, even if review is not sought. *See Swartz v. Meyers*, 204 F.3d 417, 421 (3d Cir. 2000). Furthermore, the limitations period is tolled for the "time during which a *properly filed* application for State post-conviction relief or other collateral review with respect to the pertinent judgment or claim is pending," 28 U.S.C. § 2244(d)(2)(emphasis added).

Applying these principles, the Court finds that Mr. Rivera's § 2254 petition is timely. The statute of limitations began to run when Mr. Rivera's conviction became final on June 26, 1996, 90 days after the Pennsylvania Supreme Court dismissed his direct appeal. *See* Sup.Ct. R. 13(1)(allowing 90 days for the filing of a *certiorari* petition); *Kapral v. United States*, 166 F.3d 565, 575 (3d Cir. 1999)(a judgment does not become "final" until the time for seeking certiorari review expires, even if defendant does not file such a petition). The statute was tolled when his PCRA

-18-

petition was docketed 117 days later on October 21, 1996.  The statute resumed running when the Pennsylvania Supreme Court denied his petition for allowance of appeal on March 15, 2006.  *Stokes v. Dist. Attorney of County of Philadelphia*, 247 F.3d 539, 543 (3d Cir. 2001).  Mr.  Rivera's instant federal petition was docketed 22 days later, on April 6, 2006.  Therefore, less than a year passed from the date his conviction became final to the date he filed his petition, making it timely within the meaning of 28 U.S.C. § 2244(d)(1)(A) and (2).

> B.    *Sufficiency of the Evidence Claims.*

Mr.  Rivera contends there was insufficient evidence to support his first degree murder and criminal conspiracy to commit homicide convictions.  Mr.  Rivera presented both claims in his post-sentence motion to the Lebanon County Court of Common Pleas.  He raised them again on direct appeal.  The Pennsylvania Superior Court adopted the trial court's summary of the evidence and rationale for denying his post-trial motions on these issues and affirmed Mr.  Rivera's conviction and sentence.  The Court will first address the appropriate law to be applied in reviewing these claims and then address them individually.

> 1.    *Applicable Law*

The Third Circuit Court of Appeals has held that the test for insufficiency of evidence is the same under both Pennsylvania and federal law.  *See Evans v. Court of Common Pleas, Delaware County, Pennsylvania*, 959 F.2d 1227, 1232-1233 and n. 6 (3d Cir. 1992).

Principles of due process dictate that a person can be convicted of a crime only by proof of every element of the charged offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S.Ct. 2781, 2787, 61 L.Ed.2d 560 (1979); *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970); *United States v. Ozcelik*, 527 F.3d 88, 93 (3d Cir. 2008). In reviewing challenges to the sufficiency of the evidence, a court must determine "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789 (emphasis in original). Moreover, when the factual record supports conflicting inferences, the federal court must presume, even if it does not affirmatively appear on the record, that the trier of fact resolved any such conflicts in favor of the prosecution, and the court must defer to that resolution. *Id.*, 443 U.S. at 326, 99 S.Ct. at 2793. Reviewing federal district courts are to refer to the substantive elements of the criminal offense as defined by state law and must look to state law to determine what evidence is necessary to convict on the crime charged. *Id.*, 443 U.S. at 324, 99 S.Ct. at 2792. "The burden on a defendant who raises a challenge to the sufficiency of the evidence is extremely high." *United States v. Iglesias*, 535 F.3d 150, 155 (3d Cir. 2008) (internal quotation marks omitted).

In this case, the AEDPA, however, requires the federal court to not only apply the standards of *Jackson*, *supra*, but to also determine whether the state court decision reflected an "unreasonable application" of *Jackson* to the facts of the case

under review.  *See Williams*, 529 U.S. at 407-08, 120 S.Ct. at 1520.

It is clear from the record that the trial court employed the *Jackson*, *supra*, standard in deciding the insufficiency issues raised in Mr.  Rivera's post-trial motions:

> When a defendant asks for a judgment of acquittal, he challenges the sufficiency of the evidence. Pa. R. Crim. P. 1124, 42 Pa. C.S. (Purdon 1994 Supp.).  The effect of such a motion is to admit for the purposes of the motion, all the facts which Commonwealth's evidence tends to prove. *Commonwealth v. Rawles*, 501 Pa. 504, 462 A.2d 619 (1983).  When a defendant argues that the evidence is insufficient to support the verdict, we accordingly must view the evidence in the light most favorable to the Commonwealth. *Commonwealth v. Hughes*, 521 Pa. 423, 555 A.2d 1264 (1989).  And before we may grant a motion for judgment of acquittal, we must determine that the evidence supporting the guilty verdict is so weak and inconclusive that a reasonable jury would not be satisfied as to the defendant's guilt beyond a reasonable doubt. *Commonwealth v. Kominsky*, 240 Pa. Super. 532, 361 A.2d 794 (1976).

(Doc. 19-10, *Commonwealth v. Rivera*, No. 93-10961 (Lebanon Ct. Com. Pl., Nov. 18, 1994, ECF pp. 14 - 15)).  As the state court properly identified the applicable Supreme Court precedent, the federal habeas court must objectively evaluate whether the state court decision was an unreasonable application of Supreme Court precedent.

### 2.    *First Degree Homicide*

Mr.  Rivera first challenges the sufficiency of the evidence underlying his conviction for first degree homicide on the ground that sufficient evidence was not

presented to show that the killing was premeditated.  He argues that while he did

stab the victim, he did so in self-defense as the victim was the aggressor in the

incident.  The victim's death, according to Mr.  Rivera, was the result of a tragic

accident rather than a premeditated event.

Under Pennsylvania law, a person is guilty of first degree murder where the

Commonwealth proves: (1) a human being was unlawfully killed; (2) the person

accused is responsible for the killing; and (3) the accused acted with a specific intent

to kill.  *See* 18 PA. CONS. STAT. § 2502; *Commonwealth v. Vandivner*, 599 Pa. 617,

628, 962 A.2d 1170, 1176 (2009).  An intentional killing is a "[k]illing by means of

poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated

killing."  18 Pa.C.S. § 2502(d).  Specific intent to kill can be inferred from the use of

a deadly weapon upon a vital part of the victim's body."  *Vandivner*, 599 Pa. at 628,

962 A.2d at 1176.

At trial, the Commonwealth presented compelling evidence of Mr.  Rivera's

specific intent to kill in support of the first degree murder conviction.

> The evidence . . . equivocally shows [Mr. Rivera], Mercado,
> and Lebo followed the victim after an argument at the
> corner of 11th and Lehman Streets in Lebanon.  After Lebo
> and Mercado met the victim again on 10th Street, Lebo
> struck the victim. [Mr.  Rivera] approached, and when the
> victim again left the three men, [Mr.  Rivera] followed him.
> Lebo and Mercado intercepted the victim on Partridge
> Street and Lebo resumed the argument.  After [Mr.  Rivera]
> approached the victim from behind, he took out his knife
> and stabbed him in the back.  The wound was deeper than
> the length of the knife blade.
>
> The victim, although he held a large wrench in his hand,
> never struck any of the three men who followed him from

-22-

> the site of the initial dispute, according to two witnesses,
> Michael Felty and Waldo Mercado. After the stabbing, [Mr.
> Rivera] ran off and threw the knife away.
>
> . . .
>
> We cannot find [Mr. Rivera] is entitled to judgment of
> acquittal on the charge of first-degree murder. The
> evidence adduced by the Commonwealth tends to prove
> that [Mr. Rivera] walked up behind the victim, and, in the
> absence of any need to defend himself, thrust a knife
> deeply into the victim's back. The jury was free to
> disbelieve [Mr. Rivera's] 'justification' defense, and to
> convict him.

(Doc. 19-10, ECF pp. 14 - 15.) Again, it is noted that Mr. Rivera does not dispute

that he stabbed the victim with a knife that had a five inch blade, and that the victim

died of the wounds he inflicted. As indicated earlier, the use of a deadly weapon on

a vital part of the body can provide circumstantial evidence of a criminal defendant's

specific intent. *See Vandivner*, 599 Pa. at 628, 962 A.2d at 1176. Additionally, the

trial record includes the testimony of two forensic pathologists who concurred that

the victim's wounds were more consistent with an intentional assault rather than

self-defense. Accordingly, the court concludes that there was sufficient evidence

adduced at trial for a jury to find that Mr. Rivera acted with the specific intent to kill

the victim. Further, in light of the relevant undisputed facts and the proof of specific

intent, the court finds there was sufficient evidence elicited at trial to establish all the

elements of first degree murder.

Finally, based on an independent review of the record, and after reviewing

the evidence presented at trial in the light most favorable to the prosecution,

presuming that the jury resolved all conflicting inferences from the evidence against

Mr. Rivera, the court finds that a rational juror "could reasonably have found beyond a reasonable doubt" that Mr. Rivera was guilty of first degree murder. *Jackson*, 443 U.S. at 325-26, 99 S.Ct. at 2792-93. Petitioner has failed to demonstrate that the state court's resolution of this claim was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, 28 U.S.C. § 2254(d)(1), or an unreasonable determination of the facts, 28 U.S.C. § 2254(d)(2).

### 3. *Criminal Conspiracy to Commit Murder.*

Mr. Rivera claims that there was insufficient evidence to support a conviction for criminal conspiracy to commit murder because the Commonwealth failed to establish beyond a reasonable doubt that Mr. Rivera intended to commit first degree murder. Likewise, Mr. Rivera claims the prosecution did not prove that he entered into an agreement with anyone to kill the victim.

In Pennsylvania, "[a] person is guilty of conspiracy with another person . . . to commit a crime if with the intent of promoting or facilitating its commission he: (1) agrees with such other person . . . that they or one or more of them will engage in conduct which constitutes such crime . . . or (2) agrees to aid such other person . . . in the planning or commission of such crime." 18 Pa. C.S. § 903. To convict on conspiracy, "the trier of fact must find that: (1) the defendant intended to commit or aid in the commission of the criminal act; (2) the defendant entered into an agreement with another . . . to engage in the crime; and (3) the defendant or one or more of the other co-conspirators committed an overt act in furtherance of the

agreed upon crime." *Commonwealth v. Murphy*, 577 Pa. 275, 844 A.2d 1228, 1238 (2004). "An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities." *Commonwealth v. Swerdlow*, 431 Pa. Super. 453, 460, 636 A.2d 1173, 1177 (1994). "An agreement sufficient to establish a conspiracy can be inferred from a variety of circumstances including, but not limited to, the relation between the parties, knowledge of and participation in the crime, and the circumstances and conduct of the parties surrounding the criminal episode. In fact, the Commonwealth may sustain its burden of proof by means of wholly circumstantial evidence, so long as the inferred facts flow, beyond a reasonable doubt, from the proven facts to establish the accused's guilt or elements of the crime." *Commonwealth v. Rivera*, 432 Pa. Super. 88, 91, 637 A.2d 997, 998 (1994)(internal citations omitted). Flight, along with other circumstantial evidence, supports the inference of criminal conspiracy. *See Commonwealth v. Davenport*, 307 Pa. Super. 102, 452 A.3d 1058 (1982). However, "evidence of a defendant's association with the perpetrator of the crime, presence at the scene of the crime, or knowledge of the crime cannot establish an unlawful agreement, *Commonwealth v. Murphy*, 577 Pa. 275, 844 A.2d 1228, 1238 (2004), but together, such evidence 'may coalesce to establish a conspiratorial agreement beyond a reasonable doubt where one factor alone might fail,' *Commonwealth v. Devine*, 26 A.3d 1139, 1147 (Pa. Super. 2011)(quotation omitted)." *Eley v. Erickson*, 712 F.3d. 837, 848 (3d Cir. 2013).

As noted above, there was sufficient evidence in the record to convict Mr. Rivera of first degree murder; thus, Mr. Rivera's argument that he could not have conspired with anyone to kill the victim because he did not have specific intent to kill is unpersuasive.  Mr. Rivera's next argument suggests that there was no evidence adduced at trial that he or Lebo planned the confrontation that led to the victim's death.  This argument, however, ignores much of the evidence presented at trial and the reasonable inferences that the jury could permissibly draw from such evidence.

The evidence adduced at trial demonstrated that:

> [Mr. Rivera], Mercado, and Lebo followed the victim after an argument at the corner of 11th and Lehman Streets in Lebanon.  After Lebo and Mercado met the victim again on 10th Street, Lebo struck the victim. [Mr. Rivera] approached, and when the victim again left the three men, Mr. Rivera followed him.  Lebo and Mercado intercepted the victim on Partridge Street and Lebo resumed the argument.  After [Mr. Rivera] approached the victim from behind, he took out his knife and stabbed him in the back.  The wound was deeper than the length of the knife blade.

> The victim, although he held a large wrench in his hand, never struck any of the three men who followed him from the site of the initial dispute, according to two witnesses, Michael Felty and Waldo Mercado.  After the stabbing, [Mr. Rivera] ran off and threw the knife away.

> . . .

> In this case, the two men, after the initial argument and [Mr. Rivera's] initial attack upon the victim, went off in the victim's direction and pursued him.  They split up.  Lebo then engaged the victim in an argument twice, while [Mr. Rivera] came up behind the victim.  During the second argument, when [Mr. Rivera] came up behind the victim, he stabbed him.

(Doc. 19-10, ECF pp. 14 and 16.)   From this evidence, the Court finds a rational

jury could convict Mr.  Rivera of conspiracy to commit murder.  A rational jury could find the agreement between Mr. Rivera and Lebo required to convict Mr. Rivera of criminal conspiracy to commit murder through the circumstantial evidence presented, including Mr. Rivera's close relationship with Lebo; his awareness that Lebo wanted to hurt the victim as evidenced by his instruction to Mr.  Rivera during their initial encounter with the victim  - Lebo told Mr.  Rivera to punch the victim; Mr. Rivera's departure with Lebo after the first encounter and Lebo suggested they "go beat somebody up"; his knowledge that Lebo had punched the victim; the cat-and-mouse-game of following the victim through the streets to confront him and Mr. Rivera's flight after the incident and lying to the police about his involvement.

The Court concludes that the state court's determination was not an unreasonable application of *Jackson*, *supra*.  The web of circumstantial evidence, taken as a whole, points to the existence of a criminal conspiracy carried out by Mr. Rivera and Lebo. The fact that the evidence against Mr.  Rivera was almost entirely circumstantial is not a sufficient basis to upset the jury's verdict.  Mr.  Rivera's assertion that he and Lebo "for no particular reason" began walking in the direction the victim traveled is unconvincing and the jury was free not to believe him.  The assertion that he just kept encountering the victim during his stroll through the streets of Lebanon is equally unlikely and the jury was free to weigh Mr.  Rivera's testimony as they saw fit.  The evidence provided at trial was sufficient to allow the jury to conclude there was a criminal conspiracy.

C.      *Ineffectiveness Assistance of Counsel Claims.*

Mr. Rivera alleges that his trial counsel was ineffective for failing to introduce evidence of the victim's violent tendencies to show that the victim was, in fact, the aggressor.  Mr. Rivera believes his counsel failed to bolster his self-defense strategy by failing to introduce at trial the victim's conviction for indirect criminal contempt for violating a PFA and the underlying facts that gave rise to the granting of the PFA, namely that the victim had engaged in threatening behavior towards his wife.  He raised this claim in his PCRA motion.  The trial court dismissed the claim on the basis that such evidence was not admissible and because it was without merit.  The Pennsylvania Superior Court affirmed.

1.      *Applicable Law.*

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of trial counsel, as guaranteed by the Sixth Amendment of the Constitution, was announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 675 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

-28-

To satisfy the first prong of *Strickland*, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471(2003); *Williams v. Taylor*, 529 U.S. 390-91, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000); *Grant v. Lockett*, 709 F.3d 224, 234 (3d Cir. 2013).  In so doing, a convicted defendant must overcome a strong presumption that the conduct of trial counsel fell within a wide range of reasonable professional assistance.  *Strickland*, 466 U.S. at 687-91, 104 S.Ct. at 2064-66.  An attorney does not act unreasonably or prejudice his client when he declines to raise a meritless argument.  *Real v. Shannon*, 600 F.3d 302, 309 (3d Cir. 2010).  "[I]neffectiveness will not be found based on a tactical decision which had a reasonable basis designed to serve the defendant's interests."  *Wertz v. Vaughn,* 228 F.3d 178, 190 (3d Cir. 2000)(citing *Strickland*, 466 U.S. at 690-91, 104 S.Ct. at 2066).  Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight.  *See Wiggins*, 539 U.S. at 523, 123 S.Ct. at 2536 (citing *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065).

"*Strickland* does not guarantee perfect representation, only a reasonably competent attorney."  *Harrington v. Richter*, ____ U.S. ____, ____, 131 S.Ct. 770, 791, 178 L.Ed.2d 624 (2011)(internal quotation marks omitted).  To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different.  *Wong v. Belmontes*, 558 U.S. 15, 19, 130

S.Ct. 383, 386, 175 L.Ed.2d 328 (2009)(quoting *Strickland*, 466 U.S. at 694, 104

S.Ct. at 2068); *see also Wiggins*, 539 U.S. at 534, 123 S.Ct. at 2542.  "A reasonable

probability is a probability sufficient to undermine confidence in the outcome."

*Cullen v. Pinholster*, ____ U.S. ____, ____, 131 S.Ct. 1388, 1403, 179 L.Ed.2d 557

(2011)(quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068); *see also Richter*, ____

U.S. at ____, 131 S.Ct. at 792 (the question is "whether it is 'reasonably likely' the

result would have been different.")  The prejudice component "focuses on the

question whether counsel's deficient performance renders the result of the trial

unreliable or the proceeding fundamentally unfair."  *Lockhart v. Fretwell*, 506 U.S.

364, 372, 113 S.Ct. 838, 845, 122 L.Ed.2d 180 (1993).

        A court evaluating an ineffective assistance of counsel claim does not need

to address both components of the test if the petitioner cannot sufficiently prove

either one of them.  *Knowles v. Mirzayance*, 556 U.S. 111, 122, 129 S.Ct. 1411,

1419, 173 L.Ed.2d 251 (2009)(citing *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064).

"If it is easier to dispose of an ineffectiveness claim on the ground of lack of

sufficient prejudice, ... that course should be followed."  *Strickland*, 466 U.S. at 697,

104 S.Ct. at 2069.

        In assessing a deficient performance claim, this court must first determine

whether the Pennsylvania state court applied a rule that contradicts the United

States Supreme Court's standard set forth in *Strickland* for evaluating an

ineffectiveness of counsel claim or was confronted with a set of facts materially

indistinguishable from a decision of the United States Supreme Court but reached a

different result.

In the instant matter, the Pennsylvania Superior Court used the following Pennsylvania standard in analyzing Mr. Rivera's ineffective assistance of counsel claim on appeal from the denial of his PCRA petition:

> [I]n order to successfully demonstrate ineffective assistance of counsel, [Mr. Rivera] must establish that (1) the underlying claim is of arguable merit; (2) counsel had no reasonable strategic basis for his or her action or inaction; and (3) that, but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different. *Commonwealth v. Miller*, 560 Pa. 500, 512, 746 A.2d 592, 598 (2000). We presume counsel is effective and place upon appellant the burden of proving otherwise. *Commonwealth v. Stevens*, 559 Pa. 171, 180, 739 A.2d 507, 512 (1999). A failure to satisfy any prong of the test for ineffectiveness of counsel will require rejection of the claim. *Commonwealth v. Gribble*, ___ Pa. ___, ___, 863 A.2d 455, 460 (2004).

(Doc. 19-24, ECF p. 3, *Commonwealth v. Rivera*, No. 223 MDA 2005 (Pa. Super. Aug. 17, 2005)(unpublished op.)). This three-pronged standard is derived from *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973 (Pa. 1987), and is materially identical to the test enunciated in *Strickland*. *See Commonwealth v. Fears*, 86 A.3d 795 )(Pa. 2014). The Third Circuit Court of Appeals has held that Pennsylvania's test for assessing ineffective assistance of counsel claims does not contradict the Supreme Court's holding in *Strickland*. *Abdul-Salaam v. Beard,* No. 4:02-CV-2124, 2014 WL 1653208, *14 (M.D. Pa. Apr. 24, 2014)(citing *Rainey v. Varner*, 603 F.3d 189, 197 (3d Cir. 2010)).

Because the court finds that the Pennsylvania courts did not apply a rule of law that contradicts *Strickland*, the court must now consider under § 2254(d)(1)-(2), "whether the state court's application of the *Strickland* standard was unreasonable," which is a "doubly" deferential inquiry.  *Richter*, ____U.S. at ____, 131 S.Ct. at 785; *see also Knowles*, 556 U.S. at 123, 129 S.Ct. at 1420.  The relevant inquiry in assessing ineffectiveness claims that have been adjudicated on the merits is whether the state court's decision involved an unreasonable application of *Strickland* or are based on an unreasonable determination of the facts in light of the record at the time of the state court's adjudication.  *Jacobs v. Horn*, 395 F.3d 92, 107 n. 9 (3d Cir. 2005); *Werts,* 228 F.3d at 204.  The court will now address Mr. Rivera's ineffective assistance of counsel claim.

> 2.    *Trial Counsel's Failure to Present Evidence of the Victim's Violent Character.*

Mr. Rivera claims that trial counsel was ineffective for failing to introduce evidence of the victim's violent tendencies and to show that the victim was the aggressor, and that Mr. Rivera was simply defending himself when he stabbed the victim.  Specifically, claims his trial counsel should have introduced evidence that the victim had a PFA lodged against him, and that he was convicted of violating the PFA order just eleven (11) days prior to the August 16, 1993 incident.

The thorough decision of the Pennsylvania Superior Court rejected Mr. Rivera's claim as meritless.  First, as explained by the state appellate court, it was reasonable for trial counsel to exclude the introduction of this evidence in support of

Mr. Rivera's claim of self defense strategy because Mr. Rivera admitted not knowing the victim, and thus, more importantly his character or reputation for violence, before August 16, 1993.  (Doc. 19-24, ECF pp. 3-7.)  The victim's specific acts of violent conduct were relevant only if Mr. Rivera had been aware of those acts.  As Mr. Rivera admitted not knowing the victim, the admission of the PFA, or the criminal contempt conviction for the violation of the PFA, was not relevant to Mr. Rivera's assertion that he believed his life was in danger due to the victims reputation for violence.  Likewise, the state appellate court determined that because the victim's conviction for criminal contempt of the PFA order did not involve any aggressive or violent behavior, but rather his disobedience of the terms of the PFA order, his unwanted presence at his wife's home, the criminal behavior was not similar in character to that in the instant case, and thus could not have been used to demonstrate that the victim was the aggressor in that event.  (*Id*., ECF p. 5.) Finding that the PFA, and the victim's conviction for criminal contempt of the PFA would have been inadmissible, the state appellate court found Mr. Rivera's ineffective counsel claim on this ground meritless.  An attorney does not act unreasonably or prejudice his client when he declines to raise a meritless argument. *Real v. Shannon*, 600 F.3d 302, 309 (3d Cir. 2010).

Moreover, even if Mr. Rivera could show that the evidence at issue was improperly excluded, he failed to show that its exclusion had a substantial or injurious effect at trial.  The record reflects several eye witness accounts that the victim did not strike anyone with the wrench when confronted by Mr. Rivera and others.  Additionally, the testimony of the two forensic pathologists concurred that

the victim's wounds, admittedly inflicted by Mr. Rivera, were more consistent with an intentional assault rather than self-defense.  Thus, Mr. Rivera has not established that the absence of this PFA related information at trial prejudiced the defense.

Upon reviewing the record, state appellate court's adjudication of this claim was not unreasonable.  The state court applied *Strickland* and reasonably applied the facts.  Accordingly, this court will not disturb the state court's ruling, and this claim of ineffectiveness of counsel will be denied.

## V.    Conclusion

The Court will issue an order denying the section 2254 petition.  The order will also deny a certificate of appealability, based on the analysis in this memorandum.  However, Petitioner is advised that he has the right, for thirty (30) days, to appeal the order denying his 2254 petition, *see* 28 U.S.C. § 2253(a); Fed. R. App. P. 4(a)(1)(A), and that the denial of a certificate of appealability does not prevent him from doing so, as long as he also seeks a certificate of appealability from the court of appeals.  *See* Federal Rule of Appellate Procedure 22; Local Rule of Appellate Procedure 22.1.

An appropriate Order follows.

/s/ A. Richard Caputo
**A. RICHARD CAPUTO
United States District Judge**

**Date: JUNE 2, 2014**

-34-